**Affirmed and Memorandum Opinion filed April 8, 2014.**



In The

# Fourteenth Court of Appeals

### NO. 14-13-01039-CV

### IN THE INTEREST OF A.R.M., A CHILD

**On Appeal from the 306th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 12-CP-0039**

## M E M O R A N D U M   O P I N I O N

Appellant, C.M., appeals from the trial court's order terminating his parental rights to his daughter, A.R.M. In five issues, appellant challenges the sufficiency of the evidence to support the jury's verdict, specifically, the sufficiency of the evidence supporting four predicate grounds for termination and that termination is in the child's best interest. *See* Tex. Fam. Code § 161.001. We affirm.

### I. FACTUAL AND PROCEDURAL BACKGROUND

A.R.M. was born December 16, 2008 to D.M., the mother, and appellant, the father. Although they were not formally married, the parents considered themselves husband and wife, married by common law. D.M. had two other

children by different fathers. D.M. had a long history with the Department, and she had been the subject of at least seven referrals alleging neglect of her children.

The parents were living together when A.R.M. was born. Appellant's presence after A.R.M.'s birth was sporadic because of his frequent incarcerations. The record also reflects that appellant was incarcerated several times before A.R.M. was born. After A.R.M.'s birth, appellant was in the home until March 4, 2009, when he was arrested and incarcerated again. In November, through the end of 2009, appellant resided in a halfway house. Appellant returned to the home for about two months before he was arrested again in March of 2010. On July 19, 2010, appellant was convicted of a state jail felony for unauthorized use of a vehicle and felony evading arrest and sentenced to ten months in a state jail. After serving that sentence, appellant was arrested again. He has been incarcerated since October 2, 2011, and is now serving a ten-year sentence.

In April of 2009, the Department received a referral alleging sexual abuse of one of A.R.M.'s brothers and neglectful supervision and physical neglect of all three children. The investigation that followed found that "abuse or neglect had occurred." As a result, the family was offered "safety services," which included monitoring, drug testing and treatment, counseling, and other services while the children were placed outside the home voluntarily. The boys were placed with their fathers and A.R.M. was placed with K.L., a maternal aunt by marriage, until the end of August, 2009.

As noted above, appellant resided with D.M. and the children for part of 2011 until his arrest in October of that year. There were three referrals to the Department against both D.M. and appellant in 2011 alleging physical neglect and neglectful supervision, but they were "ruled out." The Department was not involved again with the family until April 2012 when these proceedings were initiated. At that time, the Department received a referral alleging neglectful

2

supervision, methamphetamine use in the home, and sexual abuse of a child by D.M.'s uncle, a registered sex offender.

The Department's caseworker, Ms. Tavarez, who was accompanied by another caseworker and a law enforcement officer, visited D.M.'s home to investigate the allegations of neglectful supervision and sexual abuse. D.M. lived in a three-bedroom trailer, at the rear of an acre lot behind a locked gate in an isolated area in Alvin. D.M. lived there with A.R.M., her two sons, D.M.'s uncle, and a baby-sitter, B.S. Appellant was incarcerated at the time of the Department's visit. During this visit, the investigator met with D.M., one of her sons, D.M.'s uncle, the baby-sitter, and two of D.M.'s friends who were visiting. She also talked with A.R.M., who was three at the time. Neither A.R.M. nor her half-brother made an outcry about abuse. The investigator was concerned by the number of adults in the home and their mannerisms and reluctance to talk to her. D.M. was not cooperative and did not want the others to speak to the investigator. She denied using methamphetamines and refused an oral drug swab. D.M. also stated that she had no concerns about having her uncle, a sex offender, living in the home.

The baby-sitter had a prior CPS history, having voluntarily given up her children due to her methamphetamine use, and she agreed to take an oral drug test swab. The test results revealed that she had used methamphetamines within the last 48 hours. D.M. acknowledged that the baby-sitter cared for all of the children, and took care of A.R.M. while D.M. was at work. The uncle denied the sexual abuse allegation. He admitted to marijuana use, but denied use of methamphetamines, and refused to submit to an oral drug test swab. The investigator was concerned because of the uncle's "jerky fidgety body movement," which indicated to her that he might also be under the influence of methamphetamines.

As a result of this visit, D.M. agreed with the Department's placement of all of her children outside the home. The two boys were placed with their fathers.

A.R.M. was placed with D.M.'s aunt by marriage, K.L., on April 16, 2012, the date of the investigator's visit to the trailer. K.L. picked A.R.M. up and already had a car seat for the child. A.R.M. had been staying with K.L. every other week, and she had her own clothing, toddler bed, toys, and a swing set at K.L.'s home. It appeared to the investigator that A.R.M. and K.L. "had a really close relationship."

The Department first visited appellant in jail about the allegations in this case on May 17, 2012. At that time, appellant acknowledged that he was aware a sex offender lived in the home with the children and he was not concerned. He also knew that the baby-sitter lived there and she used methamphetamines. He stated D.M. was trying to keep the baby-sitter clean and sober. He denied that D.M. used methamphetamines in the home. Appellant admitted that he had been addicted to methamphetamines since he was a teenager.

The Department filed suit for protection of A.R.M. on June 8, 2012, and after a hearing, the Department was named temporary managing conservator. Appellant was still incarcerated awaiting trial on several criminal charges at that time. Appellant agreed to plead guilty shortly thereafter. Appellant's paternity was confirmed by DNA testing, and the trial court signed an order adjudicating appellant's parentage to A.R.M. on April 11, 2013.

The case was tried to a jury commencing November 12, 2013. The mother was also incarcerated at the time of trial, and she signed a voluntary relinquishment of her parental rights to A.R.M. Therefore, the trial proceeded only on termination of appellant's parental rights to A.R.M.

Appellant's records from his criminal convictions were admitted at trial. Appellant's most recent records of convictions reflect that on September 13, 2012, appellant entered pleas in three pending criminal cases. Appellant testified at trial that he agreed to the pleas because "I knew I needed help." He was sentenced to

4

serve one year in state jail for fraudulent use of identifying information. In addition, the same date, he was sentenced to serve ten years in prison for possession of methamphetamine, and he was also sentenced to serve ten years in prison for fraudulent possession of identifying information, with the sentences to be served concurrently. Appellant was serving these concurrent sentences at the time of the underlying trial. Appellant testified that he expected that he would not serve the full ten-year sentence because he was already eligible for parole and had been progressing while in jail with no behavior problems. He testified he had appeared before the parole board and received a "set off" in March of 2013, which meant that he was denied parole, but he would be considered for parole again the following year. He recognized that he could be returned to prison if he violated the terms of his parole, and he acknowledged his community supervision had been revoked at least twice before.

Although he stated he was unable to complete his court-ordered services, appellant testified he is actively working on a 12-step program in NA (Narcotics Anonymous) and regularly attending church. He stated that once he is released from prison, he planned to live on the far north side of town, away from the environment that has been a trigger for his bad habits and behavior. He testified that he has ended his relationship with D.M. He stated he has a job prospect working on a pipeline where his friend is a supervisor. He stated he believes that with the changes he is making, his daughter would be happy with him. He acknowledged that he cannot presently support A.R.M. financially due to his incarceration. Appellant also testified that he is the father to three other children, and he maintains a relationship with two of those children, although they live in Nebraska. He had not seen A.R.M. since before she was placed in the Department's custody in June of 2012, and he had only sent one card since that time. He testified his mother saw A.R.M. about once a month and provided him

with pictures and information about her. Appellant stated that during the time he was at the home, he helped to care for A.R.M. and helped to pay the bills.

In contrast to his earlier statement to the Department's investigator, appellant claimed at trial that he did not know the child's mother had started using drugs, allowed a sex offender in the home, or that one of the caretakers for the children was also using drugs. He later qualified his statement, saying that he did not know D.M. was using drugs "to the extent that I was told she was, no." He acknowledged that he had heard D.M. had "started using needles and you could see how fast she started losing weight and how bad she started looking" in early 2012. He stated he tried to get D.M. to stop taking drugs and suggested she attend NA meetings.

Appellant admitted using drugs after A.R.M. was born. Appellant acknowledged he had undergone a court-ordered 30-day drug treatment program before A.R.M. was born, but he had relapsed and used drugs after her birth. Appellant admitted using both marijuana and methamphetamines with D.M. during their relationship. He acknowledged his relationship with D.M. was volatile at times, with loud, physical arguments. He denied assaulting D.M., however. He acknowledged that D.M. had a black eye caused when he raised his hand defensively when she swung at him.

K.L's adult daughter, A.L., who was in high school when A.R.M. was born, testified at trial that A.R.M. is like a little sister. She stated her parents had raised A.R.M. since she was three and a half months old when A.R.M. stayed with K.L.'s family for a few months. A.R.M. also stayed with K.L.'s family for a couple of months in 2010, and she had lived with the family since 2012. A.L. testified she was excited about A.R.M.'s birth and visited her both at the hospital and later at D.M.'s home. She never saw appellant at the home. A.L. was concerned about the filthy living conditions at D.M.'s trailer. There frequently were a lot of people at

the home, and she found people passed out on the couch during the middle of the day.

A.L. described how her parents provided everything she and her brother ever needed and they never denied A.R.M. anything or questioned being asked to take care of her. She testified that A.R.M. deserves to have permanency and to be in a loving home with people able to support her, like her parents. A.L. testified she takes A.R.M. to gymnastics twice a week, and she took her to cheerleading camp. She stated A.R.M. likes dancing, riding her bike, and going to birthday parties where she likes to jump in moon walks. AL. testified A.R.M. seems to be happy.

Another Department caseworker responsible for substitute care, Ms. Sonstein, also testified. She had been assigned this case when the Department first obtained custody of A.R.M. She visited K.L.'s home and found a loving home with a swing set and lots of toys. A.R.M. appeared to be treated like part of the family and she seemed very happy. Ms. Sonstein testified she visits A.R.M. monthly, and she is currently living in safe and loving environment with a "brother and sister" at K.L.'s home. Ms. Sonstein testified that it is the Department's plan for A.R.M. to be adopted by K.L. and her husband, which would be in the child's best interest. She testified A.R.M. calls them mom and dad and has a normal parent-child relationship with them. She said A.R.M. is doing "great," and has "a lot of love."

Ms. Sonstein testified she provided appellant with a family service plan at a status hearing on August 2, 2012, although she did not file the plan with the court at that time. She also visited appellant in jail on July 18, 2012, to talk to him about his services. Appellant expressed his willingness to comply with the services and to change his life. He sent her a letter thanking her for her encouragement at the visit. She did not see appellant again until May 28, 2013, at a conference in preparation for trial. At that time, appellant signed the plan. She explained that when a parent is incarcerated, he may not be able to comply with all the required

services, but he is asked to perform those services that are available at his facility. She testified that appellant has never exhibited good parenting skills and has not done anything to change that. He has not been present for A.R.M. physically or emotionally. He has not provided support or stability. Appellant has never provided a safe and stable home for A.R.M. and it does not appear that he would be able to do so in the near future. Ms. Sonstein was concerned that appellant acknowledged D.M. was using drugs when A.R.M. was in her care, but he did nothing about it. Although he knew how to reach Ms. Sonstein, appellant never contacted her to check on A.R.M.'s well-being.

K.L. testified at trial that she and her husband want to adopt A.R.M. and provide stability for her. K.L's husband has been employed by the same paint company for twenty-five years. She described A.R.M. as "full of life." She testified appellant was in jail for most of A.R.M.'s life, having been incarcerated for nine months in 2009 and five or six months in 2010, and again in 2011 until the present. She testified appellant has never contacted her and she has never received a call or letter for A.R.M. from appellant. She never received any monetary or other support from appellant or his mother. She testified she receives a text from appellant's mother every two to three months.

At the conclusion of the trial, the jury returned a verdict finding appellant's parental rights should be terminated based on at least one of four predicate grounds. In addition, the jury found termination is in the child's best interest. Appellant filed a notice of appeal on November 18, 2013. *See* Tex. R. App. P. 27.1 (stating a prematurely filed notice of appeal is effective and deemed filed on the day of, but after, the judgment is signed). The trial court signed an order terminating appellant's parental rights on November 21, 2013. No motion for new trial was filed.

## II. PRESERVATION OF ERROR AND STANDARD OF REVIEW

After a jury trial, a party must preserve a legal sufficiency of the evidence challenge by: (1) a motion for instructed verdict; (2) a motion for judgment notwithstanding the verdict; (3) an objection to the submission of a jury question; (4) a motion to disregard the jury's answer to a vital fact issue; or (5) a motion for new trial. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 220 (Tex. 1992); *see also In re L.C.W.*, 411 S.W.3d 116, 126 (Tex. App.—El Paso 2013, no pet.); *In re J.M.S.*, 43 S.W.3d 60, 62 (Tex. App.—Houston [1st Dist.] 2001, no pet.). Here, the trial court denied appellant's motion for a directed verdict at the close of the Department's case, and no further evidence was admitted after that ruling.. Therefore, appellant has preserved his legal-sufficiency challenges.

A complaint that the evidence is factually insufficient to support a jury finding must be raised in a motion for new trial as a prerequisite to raising such a complaint on appeal. *See In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003); *In re L.C.W.*, 411 S.W.3d at 126; *see also* Tex. R. Civ. P. 324(b)(2). Because appellant failed to move for a new trial, he failed to preserve his factual sufficiency challenges for our consideration. *See In re D.J.J.*, 178 S.W.3d 424, 426–27 (Tex. App.—Fort Worth 2005, no pet.).

Due to the severity and permanency of the termination of parental rights, the burden of proof at trial is heightened to the clear and convincing standard. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007. This heightened burden of proof results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

When determining legal sufficiency, we review "all the evidence in the light most favorable to the court's finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. To give appropriate deference to the factfinder's conclusions, we must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* However, this does not mean that we must disregard all evidence that does not support the finding. *Id..* Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.*

In a proceeding to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, the petitioner must establish, by clear and convincing evidence, one or more acts or omissions enumerated under subsection (1) of section 161.001 and that termination is in the best interest of the child under subsection (2). Tex. Fam. Code § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). We need only determine if the evidence is legally sufficient to support a single predicate ground for termination and the trial court's finding that the termination is in the best interest of the children. *See* Tex. Fam. Code § 161.001; *In re A.V.,* 113 S.W.3d 355, 362 (Tex. 2003); *In re A.L.,* 389 S.W.3d 896, 900 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

### III. ANALYSIS

The trial court's judgment recites that appellant's parental rights were terminated based on the predicate findings in subsections D, E, F, and N of Texas Family Code Section 161.001(1). Under these subsections, termination is warranted if the trial court finds by clear and convincing evidence that the parent has

(D) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

(F) failed to support the child in accordance with the parent's ability during a period of one year ending within six months of the date of the filing of the petition;[1]

(N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months, and:

(i) the department or authorized agency has made reasonable efforts to return the child to the parent;

(ii) the parent has not regularly visited or maintained significant contact with the child; and

(iii) the parent has demonstrated an inability to provide the child with a safe environment.

Tex. Fam. Code § 161.001(1) (D), (E), (F), & (N).

## A.    Endangerment

We first review the evidence supporting the jury's finding that appellant engaged in conduct or knowingly placed A.R.M. with persons who engaged in conduct that endangered A.R.M.'s physical or emotional well-being, which is the subject of appellant's second issue. *See* Tex. Fam. Code § 161.001(1)(E). In this context, endanger means to expose to loss or injury, or to jeopardize a child's emotional or physical health. *Castaneda v. Tex. Dep't. of Protective and Regulatory Servs.*, 148 S.W.3d 509, 521–22 (Tex. App.—El Paso 2004, pet. denied) (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.

---

[1] The Department concedes that the evidence is insufficient to support termination under Section 161.001(1)(F) of the Texas Family Code.

1987)). The relevant inquiry for a subsection E termination is whether evidence exists that the endangerment was the direct result of the parent's conduct, including acts, omissions, and failures to act. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Endangerment may be inferred from parental misconduct even if the conduct is not directed at the child and the child suffers no actual injury. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied).

It is well settled that endangering conduct in a termination proceeding may include parental conduct both before and after the birth of a child. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (considering offenses that occurred before the child was born as part of a voluntary, deliberate, and conscious course of conduct that had the effect of endangering the child); *see also In re D.M.*, 58 S.W.3d 801, 812–13 (Tex. App.—Fort Worth 2001, no pet.); *In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at *5 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.). Moreover, the conduct need not occur in the child's presence, and courts may consider conduct both before and after the Department removed the child from the home. *Avery v. State,* 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no writ).

Despite the fact that appellant considered himself married to A.R.M.'s mother under common law, and he admitted at trial that there was never any doubt that he was A.R.M's father, appellant argues that because he was not adjudicated to be her parent until April 11, 2013, his actions prior to that time cannot be considered. We disagree.

To the contrary, a father's conduct prior to the establishment of paternity may be considered as evidence of an endangering course of conduct. *In re R.W.*, 129 S.W.3d at 738. Courts may consider criminal offenses and incarceration that

12

occurred before paternity has been adjudicated in reviewing endangering conduct. *See In re U.P.,* 105 S.W.3d 222, 233 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (considering appellant's drug abuse and criminal history including conviction for manufacture and delivery of cocaine that occurred before his adjudication of paternity in finding sufficient evidence of endangerment); *In re S.F.,* 32 S.W.3d 318, 321 (Tex. App.—San Antonio 2000, no pet.) (considering father's conduct before he signed affidavit of paternity and holding father's criminal behavior before imprisonment and continued misbehavior during prison term showed course of conduct detrimental to the child). While knowledge of paternity may be a prerequisite to a showing of knowing placement of a child in an endangering environment under subsection D, it is not a prerequisite to a showing of a course of conduct which endangers a child under subsection E. *A.S. v. Texas Dep't of Family & Protective Servs*., 394 S.W.3d 703, 712-13 (Tex. App.—El Paso 2012, no pet.) (stating knowledge of paternity is not a prerequisite under subsection E); *In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex. App.—San Antonio 2000, pet. denied) (same).

In a leading case construing endangerment in the parental termination context, *Texas Department of Human Services v. Boyd,* the Texas Supreme Court, citing the father's frequent imprisonment and that he was serving a five-year sentence at the time of trial, held that courts may consider imprisonment as a factor on the issue of endangerment. 727 S.W.2d at 533. The father, who was not married to the child's mother, cross-petitioned to legitimate the child, and the order legitimating the child was signed at the same time the order terminating the father's parental rights was signed. *Id.* at 532. In considering whether the father had endangered the emotional or physical well-being of the child, the Supreme Court rejected the court of appeals' holding that danger cannot be inferred from parental misconduct, including his imprisonment. *Id.* While imprisonment alone is

13

insufficient to establish a parent has endangered the physical or emotional well-being of a child, it is a fact properly considered on the issue of endangerment. *Id.* at 533–34. The Supreme Court held that evidence, including imprisonment, can show a course of conduct having the effect of endangering the physical or emotional well-being of the child to support an endangerment finding under subsection E. *Id.* at 534 (citing prior version of statute).[2]

Therefore, evidence of criminal conduct, convictions, or imprisonment may support a finding that the parent engaged in a course of conduct that endangered the well-being of the child under Subsection E. *See In re J.T.G.*, 121 S.W.3d at 133; *see also In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (observing that father's incarceration affected his ability to ensure that his child was properly taken care of, prevented him from finding better living conditions or providing financial support for the child, and indicated a course of conduct that was endangering to his child).

Accordingly, we may consider appellant's actions before his paternity was adjudicated. Appellant has an extensive criminal record starting before A.R.M. was born and continuing through trial. In August 2004, he was convicted of possession of methamphetamine and sentenced to two years in a state jail facility, probated for two years. In February 2005, appellant's probation was revoked, and he was sentenced in nine months in a state jail. In August 2006, appellant pled guilty in federal court to a charge of uttering counterfeit obligations or securities and possession with intent to distribute methamphetamine, and he was sentenced to 21

---

[2] In *Boyd,* the Texas Supreme Court interpreted Section 15.02(1)(E) of the Texas Family Code, the prior version of Section 161.001(1)(E), which is virtually identical to the present statute and provided for termination if the court found the parent had:

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.

*Boyd,* 727 S.W.2d at 533.

months in prison. Upon his release from prison, appellant was on supervised release for three years. In April 2009, after A.R.M.'s birth, appellant's federal supervised release was revoked for multiple violations, including the failure to participate in drug, alcohol, and mental health treatment, and failure to submit to random urine analysis. He was sentenced to nine months in prison. On July 19, 2010, appellant was convicted of a state jail felony for unauthorized use of a vehicle and felony evading arrest and sentenced to ten months in a state jail. The judgment reflects appellant was incarcerated beginning March 4, 2009. In August of 2011, he was indicted for providing a false statement to obtain credit. That case was dismissed as part of a plea bargain in 2012, when he pled guilty to possession of methamphetamine and fraudulent possession and use of identifying information. He is currently serving the remainder of a ten-year sentence as a result of the crimes he committed after A.R.M.'s birth. Appellant's pattern of criminal behavior and repeated imprisonment for much of his daughter's life demonstrates a course of conduct sufficient to support an endangerment finding.

In addition, a pattern of drug abuse will also support a finding of conduct endangering a child even if there is no evidence that the drug use injured the child. *Vasquez v. Tex. Dep't of Protective and Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). A history of illegal drug use and drug-related criminal activity is conduct that subjects a child to a life that is uncertain and unstable, endangering her physical and emotional well-being. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.-Dallas 1995, no writ). Drug addiction and its effect on a parent's life and ability to parent may establish an endangering course of conduct. *In re J.T.G.,* 121 S.W.3d at 125.

Appellant acknowledged he had been addicted to methamphetamines since

he was a teenager. He acknowledged using drugs with A.R.M.'s mother during their relationship. Appellant also admitted to drug use after A.R.M. was born. Moreover, in appellant's absence due to his imprisonment, the mother's drug use escalated, and appellant did nothing to protect A.R.M. There is legally sufficient evidence to support a finding that these actions and omissions endangered A.R.M.'s physical and emotional well-being.

Considering all of the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true under the applicable standard of review, we conclude that a reasonable fact finder could have formed a firm belief or conviction that appellant endangered the emotional and physical well-being of A.R.M. through his course of conduct described above. We find the evidence presented legally sufficient to support termination under Section 161.001(1)(E). Accordingly, we overrule appellant's second issue. As only one predicate finding under Section 161.001(1) is necessary, we need not address the other predicate findings. *See In re A.V.*, 113 S.W.3d at 362.

## B.    Best Interest

We next address appellant's fifth issue, in which we review the legal sufficiency of the evidence supporting the jury's finding that termination of appellant's parental rights is in the child's best interest. There is a strong presumption that the best interest of a child is served by keeping the child with its natural parent, and the burden is on the Department to rebut that presumption. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The same evidence of acts or omissions used to establish grounds for termination under section 161.001(1) may be probative in determining the best interest of the child. *Id.* In reviewing the sufficiency of the evidence to support the second prong, a court examines several factors, including (1) the desires of the child, (2) the present

and future physical and emotional needs of the child, (3) the present and future emotional and physical danger to the child, (4) the parental abilities of the persons seeking custody, (5) the programs available to assist those persons seeking custody in promoting the best interest of the child, (6) the plans for the child by the individuals or agency seeking custody, (7) the stability of the home or proposed placement, (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate, and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). This list is not exhaustive, and evidence is not required on all nine factors to support a finding terminating a parent's rights. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533.

For cases in which the Department or another government agency is the petitioner, Section 263.307(a) of the Texas Family Code provides that "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tex. Fam. Code § 263.307(a). Section 263.307(b) lists the factors to consider in determining whether a parent is "willing to provide the child with a safe environment." *Id.* § 263.307(b). Those factors include: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department or other agency; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm is identified; (10) the willingness

17

and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. *Id*. With these considerations in mind, we review the evidence below.

*Desires of the Child*

Although there was no direct testimony of A.R.M.'s wishes, A.R.M. has bonded with K.L. and her family. She refers to K.L. and her husband as mom and dad. There was testimony that A.R.M. is happy in her current placement. She had not seen or spoken to appellant in well over a year at the time of trial. This factor weighs in favor of the jury's finding.

*Physical and Emotional Needs*

There was evidence A.R.M.'s physical and emotional needs are being met in her current placement. There was also evidence that appellant is currently unable to meet those needs due to his incarceration. A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs. *See In re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003, no pet.)

18

(concluding the evidence was sufficient to support best-interest finding where mother admitted being unable to care for child, had no stable source of income or permanent home). A parent's current and future incarceration at the time of trial is relevant to that parent's ability to meet the child's present and future physical and emotional needs. *A.S.*, 394 S.W.3d at 715.

Appellant's continued lack of contact with A.R.M due to his frequent previous incarcerations and his current ten-year prison sentence establish that appellant is unable to meet A.R.M.'s emotional or physical needs, presently or in the future. *See In re S.M.L.*, 171 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (explaining that because when a parent is incarcerated, he is absent from a child's daily life and is unable to provide support, a parent's pattern of intentional criminal activity that exposes the parent to incarceration is conduct that can negatively impact a child's living environment and emotional well-being). This factor also weighs in favor of the jury's finding.

*Danger to the Child and Parental Acts and Omissions*

The evidence regarding endangerment, discussed in support of the trial court's finding under section 161.001(1)(E) above, is also probative of a finding as to danger in determining the child's best interest. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002); *see also In re B.K.D.*, 131 S.W.3d 10, 17 (Tex. App.—Fort Worth 2003) (recognizing that factfinder may infer that past conduct endangering child's well-being may recur in the future if child is returned to the parent).

Evidence of a parent's unstable lifestyle can also support the conclusion that termination is in the child's best interest. *In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.). In particular, a parent's drug use can support a finding that termination is in the best interest of the child. *Id*. Appellant admitted he had been addicted to methamphetamines. Appellant's history reflected that he

was habitually engaged in criminal activity, with frequent arrests and imprisonment. Appellant acknowledged that he had violated the terms of community supervision on at least two prior occasions.

Each time appellant was jailed, he was absent from his child's life and unable to provide support, which negatively impacted A.R.M.'s living environment and well-being. *See In re D.M*., 58 S.W.3d at 812–13 (noting that mother's frequent incarcerations affected her ability to properly care for her children); *see also In re U.P*., 105 S.W.3d at 236 (holding that the creation of an "emotional vacuum" in the child's life by being absent for more than twelve months due to incarceration was evidence of endangering the child's emotional well-being); *In re J.N.R*., 982 S.W.2d 137, 143 (Tex. App.—Houston [1st Dist.] 1998, no pet.) (affirming the termination of father's parental rights based in part on evidence that father continued to engage in the criminal activity that resulted in his incarceration even after knowing his parental rights were in jeopardy).

The jury could reasonably have inferred that appellant's history of drug use and criminal behavior could pose a danger to A.R.M. in the future. These factors support the jury's finding.

*Current Placement*

There was overwhelming evidence that A.R.M. is thriving in her current placement with K.L. She has bonded with K.L. and her family, who are meeting A.R.M.'s physical and emotional needs. The home is stable and loving. K.L. and her husband plan to adopt A.R.M. The goal of establishing a stable, permanent home for a child is a compelling state interest. *In re C.E.K*., 214 S.W.3d 492, 498 (Tex. App.—Dallas 2006, no pet.). Ongoing proceedings would not have provided the child the permanency, stability, and consistency that she needed. *See In re D.R.A*., 374 S.W.3d at 533 (noting that the need for permanence is a paramount

consideration in determining the child's present and future physical and emotional needs). This factor also weighs in favor of the jury's finding.

Viewing all the evidence in the light most favorable to the judgment, we conclude that the factfinder could have formed a firm belief or conviction that termination of appellant's parental rights was in the child's best interest. *See* Tex. Fam. Code § 161 .001(2); *In re J.F.C.*, 96 S.W.3d at 265–66. Therefore, we hold the evidence is legally sufficient to support the trial court's finding that termination of the parent-child relationship is in A.R.M.'s best interest. We overrule appellant's fifth issue.

## IV. CONCLUSION

Having found legally sufficient evidence to support the jury's finding of at least one predicate ground under Section 161.001(1) and that termination of appellant's parental rights is in the child's best interest under Section 161.001(2), we order the trial court's judgment affirmed.


/s/     Marc W. Brown
        Justice


Panel consists of Chief Justice Frost and Justices Donovan, and Brown.